## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Autumn LARSON, | Court File No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| CITY OF MINNEAPOLIS; DOE OFFICERS #1-30, *in their individual and official capacities*, | **JURY TRIAL DEMANDED PURSUANT TO FED. R. CIV. P. 38(B)** |
| Defendants. | |

For her Complaint against the City of Minneapolis and Doe Officers #1-30 (collectively, the "Defendants"), Plaintiff Autumn Larson ("Autumn") hereby states and alleges as follows:

## INTRODUCTION

1.      This is an action under 42 U.S.C. § 1983 seeking money damages as compensation for Defendants' violation of Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

2.      This action also states common law battery and negligence claims pursuant to MINN. STAT. § 466.02 against thirty (30) police officers whose identities are not yet known, but who are referred to in this Complaint as Doe Officers #1-30 (collectively, "Doe Officers," or "Doe Defendants") in their individual and official capacities (differentiated by claim as set forth below), and against the City of Minneapolis,

Minnesota, for the actions of its agents and employees, Minneapolis Mayor Jacob Frey, Minneapolis Police Chief Medaria Arradondo, and the Doe Officers.

3.    Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and claim joinder is appropriate under Fed. R. Civ. P. 18.

4.    It is alleged that on May 30, 2020, one or more of the Doe Defendants engaged in an action, or actions, that resulted in the unreasonable seizure of Plaintiff, thereby violating her rights under the Fourth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, as well as her rights to due process under the Fourteenth Amendment.

5.    Defendants violated Plaintiff's constitutional rights because of, *inter alia*, the policies or customs of the City of Minneapolis and the Minneapolis Police Department, under the supervision of Minneapolis Police Chief Medaria Arradondo and Minneapolis Mayor Jacob Frey.

6.    On May 29, 2020, Defendant City of Minneapolis, through Minneapolis Mayor Jacob Frey, engaged in action that unconstitutionally deprived Plaintiff of her rights under the First Amendment to speak and assemble, as made applicable to the states through the Fourteenth Amendment.

7.    In enforcing the Mayor's actions on May 30, 2020, Defendant City of Minneapolis, through its agents, including Police Chief Medaria Arradondo and Doe Defendants, unconstitutionally deprived Plaintiff of her rights under the First Amendment to speak and assemble, as made applicable to the states by the Fourteenth Amendment.

8.     Doe Defendants committed a common law battery against Plaintiff for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02 and/or MINN. STAT. § 3.736.

9.     Doe Defendants breached their duty of reasonable care to Plaintiff by conducting a seizure of Plaintiff in a constitutionally impermissible manner. Doe Defendants breached this duty by discharging their "less lethal" firearms in her direction in an act of common law negligence for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02 and/or MINN. STAT. § 3.736.

## PARTIES

### *Plaintiff Autumn Larson*

10.     Plaintiff Autumn Larson ("Autumn") was amongst those who assembled to peacefully protest the killing of George Floyd on May 30, 2020.

11.     Autumn is 25 years of age; is a mother to three children ages 5, 2, and 1; and at all material times herein, has lived in Maple Grove, Minnesota.

12.     Autumn has no criminal record, was born in Coon Rapids, Minnesota, and has been a United States citizen since birth.

### *Defendant City of Minneapolis*

13.     Defendant City of Minneapolis ( "Minneapolis") is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

14.     The Minneapolis Police Department ( "MPD") is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

15.     Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

16.     Minneapolis Mayor Jacob Frey ( "Frey") is and was at all times relevant to this action, the Mayor of Minneapolis and the chief policymaker responsible for implementing curfew orders and authorizing MPD's use of force.

17.     Minneapolis Police Chief Medaria Arradondo, ( "Arradondo") is and was, at all times relevant to this action, the MPD police chief and a policymaker for his department.

### *Defendants Doe Officers*

18.     Upon information and belief, Autumn alleges that Doe Officers were the agents, servants, and employees of Defendant Minneapolis and/or the MPD.

19.     The Doe Officers were likely members of the MPD, though they may have been operating in Minneapolis at the direction of the Mayor and Governor under the auspices of another law enforcement agency.

20.     Autumn does not yet know the true names and capacities of the Doe Defendants sued herein as Doe Officers #1-30, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

21.     All individual Doe Defendants are sued in both their individual and official capacities.

22.     For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Doe Defendants are sued in their individual capacity. While Plaintiff also faults Doe Defendants for the

actions they performed in their official capacity, these harms are imputed to the City of Minneapolis and need not be realleged.

23.     For purposes of Plaintiff's state law claims, Doe Defendants are sued in both their individual and official capacities.

24.     Upon information and belief, Autumn alleges that at all times relevant hereto, Doe Defendants, in addition to the named Defendants, are responsible in some manner, in part or whole, for the damages and injuries alleged herein.

25.     Upon information and belief, Autumn alleges that at all times relevant hereto, Doe Defendants, and each of them, were the agents, servants and employees of Defendant Minneapolis and were acting at all times within the scope of their agency and employment with the knowledge and consent of their principal employer.

26.     At all times Defendants were acting under color of state law.

27.     Upon information and belief, Autumn alleges that the practices, policies, and customs of Minneapolis and/or the MPD caused the unlawful action taken against Autumn.

## **JURISDICTION**

28.     Because the federal statutory and constitutional claims alleged in this Complaint arise under federal law, this Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the state law claims alleged in this Complaint, which are so related to Autumn's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

**VENUE**

29.     Pursuant to 28 U.S.C. § 1391(b), this Court is the proper venue for this matter because a substantial part of the events and/or omissions giving rise to the claims alleged in this Complaint occurred within the District of Minnesota. Alternatively, some, or all, of the Defendants also reside within the District of Minnesota.

**FACTUAL BACKGROUND**

31.     On May 26, 2020, following the death of George Floyd at the hands of MPD officers the night before, thousands of Minneapolis residents took to the city's public streets and spaces to protest the unjustifiable killing of Mr. Floyd, as well as police killings of other people of color. As city officials acknowledged, the vast majority of these protesters exercised their First Amendment rights in a forthright, peaceful, and lawful manner.

32.     On the evening of May 27, 2020, the Minneapolis Fire Department responded to a number of fires that occurred in the vicinity of the Third Precinct along Lake Street near the intersection with Hiawatha Avenue. Mayor Frey responded by declaring a state of emergency, citing fires and unrest in the Third Precinct and surrounding area.

33.     On May 28, 2020, the Fire Department again responded to a number of fires along Lake Street in the vicinity of the Third Precinct. Several additional fires also broke out in the vicinity of Broadway Avenue on the city's north side.

34.     Upon information and belief, in total, all the building fires experienced throughout Minneapolis, and the vast majority of the property crimes that prompted the

order, were confined to two discrete areas around Lake Street on the south side, and Broadway Avenue on the north. Together, these areas constituted about four of Minneapolis's fifty-eight square miles.

35.     Upon information and belief, over the full period in which the curfews were in effect, and the two days prior, half of Minneapolis's eighty-seven neighborhoods experienced no fire activity, protest related or otherwise.

36.     Upon information and belief, fifty-three of Minneapolis's eighty-seven neighborhoods experienced no building fires.

37.     On May 29, 2020, Mayor Frey issued Emergency Regulation 2020-2-1, implementing a city-wide curfew between the hours of 8:00 PM on May 29, 2020 and 6:00 AM on May 30, 2020, and between the hours of 8:00 PM on May 30, 2020 and 6:00 AM on May 31, 2020.

38.     This order, in tandem with subsequent but similar measures, ultimately mandated that all individuals stay off the streets throughout the city for seven consecutive evenings despite the fact that the fires and unrest that prompted the orders were largely confined to two relatively small areas, one along Lake Street, miles south of downtown, and the other centered on Broadway Avenue on the city's north side.

39.     Upon information and belief, in issuing the order, Minneapolis officials acknowledged that peaceful protesters would be caught up in the enforcement and indicated that anyone out beyond the curfew would be treated as if they were aiding and abetting those seeking to do property damage.

40.     Upon information and belief, Minneapolis officials characterized the outright criminalization of First Amendment activity, and MPD's violent enforcement of the curfew order, as necessary to restore order.

41.     At the time Mayor Frey issued Emergency Regulation 2020-2-1, he acted under the color of the statutes, ordinances, regulations, customs, and usages of Defendant Minneapolis and the State of Minnesota under the apparent authority of his office as Mayor and MINN. STAT. § 12.29.

**A.     The Protest**

42.     In the early evening of May 30, 2020, Autumn attended one of the protests in the aftermath of Mr. Floyd's senseless slaying in an effort to exercise her constitutional rights to assemble in order to make known and voice her displeasure with the violence perpetrated by MPD officers against people of color and particularly against African-American men.

43.     Autumn attended this protest, which was principally located on East 31st Street and Nicollet Avenue, with her sister and a few close friends, arriving at the protest in two separate cars at approximately 7:00 p.m. Autumn and her sister shared a vehicle.

44.     After parking her car nearby on Stevens Avenue, Autumn and her sister walked approximately ten (10) minutes to the intersection of East 31st Street and Nicollet Avenue.

45.     Autumn and her sister planned to attend the protest for a brief time, and then return home to their children.

46.     When they arrived at the protest, they saw people sitting down on the ground. A station was set up with a microphone and PA system, and protesters were leading prayers, telling stories, and giving speeches. No violent or destructive activity took place at this protest.

47.     Autumn and her sister stayed at the protest until approximately 8:00 p.m.

**B.     Post-Protest**

48.     At approximately 8:00 p.m., the people in attendance of this protest began to walk towards Stevens Avenue where Autumn had previously parked her car.

49.     Done with protesting and attempting to comply with the curfew order, Autumn followed this group of people so that she could retrieve her car and return home to her children.

50.     If Mayor Frey's emergency regulation, or Minnesota Governor Tim Walz's Emergency Executive Order No. 20-65, were themselves lawful, Autumn's presence on the street at or shortly after 8:00 PM was punishable as a misdemeanor by up to ninety days in jail or a $1,000 fine. *See* MINN. STAT. § 12.45; MINNEAPOLIS, MINN., CODE OF ORDINANCES § 1.30.

51.     When Autumn was approximately one block away from her car, police officers, without warning, began firing, upon information and belief, tear gas, flash bang grenades, and other projectiles into the group of people.

52.     Upon information and belief, Mayor Frey and the City of Minneapolis selectively enforced the curfew orders, granting informal exemptions to certain individuals and organizations.

53.     By firing what appeared to be tear gas, flash bang grenades, and other projectiles into this group of people, the police officers caused confusion, disorientation, and fear within the crowd, causing the group of people to scatter chaotically.

54.     Autumn ran several blocks to try to escape injury from these projectiles, which caused her to end up even further away from her parked car than when she started.

55.     A local neighborhood resident allowed Autumn into her home, where she allowed Autumn to use the toilet, wash the chemicals the police had fired at her off her face, and provided Autumn with a safe place to regroup with her sister, from whom she was separated from in the chaos of the police activity.

### C.     Attempts to Return Home

56.     After Autumn regrouped with her sister at this local resident's house, they began to walk back to Stevens Avenue to once again, attempt to retrieve their car and return home.

57.     Autumn and her sister discovered that police officers had blocked off an intersection they needed to pass through in order to reach her parked car.

58.     The police officers began to shout at Autumn to go home, to which Autumn and her sister attempted to explain that they were trying to get to their car so they could do so.

59.     Rather than allow Autumn to pass, the police officers fired, upon information and belief, a flash bang grenade, or other projectile, at Autumn, narrowly missing her, and continued to fire, upon information and belief, tear gas in her and her sister's direction.

10

60.     The police began to charge at Autumn and her sister, once again causing them to have to flee to find a safe place.

61.     Another local resident allowed Autumn and her sister to wait in the resident's yard until the police presence dissipated and they could safely return to their car. Autumn stayed in this resident's yard for approximately twenty (20) minutes until she deemed it safe to return to her car.

62.     Autumn was eventually able to reach her car, and she began to make the drive home with her sister. Autumn was driving, and her sister was seated in the front passenger seat.

63.     Autumn eventually was able to reach the intersection of East Lake Street and Hiawatha Avenue, the intersection she needed to be on to reach Highway 55 and return home to her family.

### D.     Attempts to Enter Highway 55

64.     When Autumn reached the intersection of East Lake Street and Hiawatha Avenue, she was initially unable to maneuver her vehicle onto the northbound on-ramp of Highway 55. A large group of protesters had moved into the intersection, blocking Lake Street and her path to the highway. Autumn was not participating in these protests.

65.     A large police presence also existed near this intersection, but were not blocking the northbound on-ramp to Highway 55.

66.     Autumn was eventually able to safely maneuver her vehicle around the protesters and enter the northbound on-ramp to Highway 55, but was blocked by a black SUV, located on the on-ramp, that was maneuvering oddly. The Black SUV would inch

forward, stop, reverse, and turn spontaneously. This made it unsafe for Autumn to attempt to pass the black SUV and continue onto Highway 55.

67.     For demonstration, if Autumn's vehicle was facing 12 o'clock, on the northbound on-ramp to the highway, the protesters were located at approximately 4 o'clock, in the middle of Lake Street, and the Doe Defendants were located at approximately 10 o'clock, at or near the Highway 55 overpass over Lake Street.

**E.     Struck with a Projectile and Subsequent Injuries**

68.     While Autumn was stopped behind the black SUV on the northbound on-ramp, the police officers began shouting at Autumn to leave the area.

69.     Autumn rolled down her car window so she would be better able to hear the orders being given by the police officers.

70.     In following the police officers' orders to leave the area, Autumn attempted to drive around and pass the black SUV on the northbound on-ramp, but just as she did this, without warning, the Doe Defendants fired a cannister of tear gas directly at her car, striking the side of the vehicle and leaving a dent in the driver-side door.



71.     Because Autumn's driver-side window was open, the tear gas fired by the police entered her car, causing her to choke and blind her. Autumn immediately braked, stopping the vehicle.

72.     The smoke around Autumn's car dissipated quickly, and because she was now disabled by the tear gas, unable to breath, and unable to see, she moved her head towards the open driver-side window in an effort to breathe.

73.     As she did this, one or more of the Doe Defendants fired, upon information and belief, one or more projectiles directly at Autumn's face, striking her on the bridge of her nose, knocking her unconscious at the wheel of her still-running car.

74.     The Doe Defendants did not tell Autumn she was under arrest before firing.

75.     The Doe Defendants did not tell Autumn's sister she was under arrest before firing.

76.     The Doe Defendants did not tell Autumn to get out of her car before firing.

77.     The Doe Defendants did not tell Autumn's sister to get out of the car before firing.

78.     The Doe Defendants did not tell Autumn to show them her hands before firing.

79.     The Doe Defendants did not tell Autumn's sister to show them her hands before firing.

80.     Autumn was given no chance to surrender, peacefully or otherwise, to avoid being fired upon.

81.     When Autumn returned to consciousness, she found herself facing the direction of her sister, who was sitting in the front passenger seat. Fortunately, Autumn still had her foot on the brake of her car.

82.     Autumn, with her sister's assistance, managed to move her car to the side of the Highway on-ramp, and got out of the car so as to treat her wounds and allow her sister to drive.

83.     None of the Doe Defendants sought to render aid to Autumn.

84.     None of the Doe Defendants sought to handcuff Autumn or issue a citation to Autumn.

85.     At no point prior to the shooting did Autumn or her sister move towards the Doe Defendants in a threatening manner.

86.     At no point prior to the shooting did Autumn or her sister engage in conduct which could be construed as an attempt to damage property or threaten the safety of any person.

87.     At no point prior to the shooting did the Doe Defendants move to effect an arrest of Autumn or her sister or to apprehend them.

88.     Instead, Doe Defendants instructed Autumn to leave the scene, and when she attempted to do just that, they shot her in the face without a verbal warning and then left her to bleed in the street.

89.     The driver of the black SUV assisted Autumn in bandaging her wounds and recommended that she go immediately to the hospital because her wounds were deep and likely required medical attention.

90.     The aftermath of the shooting was captured on video by WCCO news. At no point in this video can the Doe Defendants be seen attempting to effect an arrest on Autumn or her sister, nor can Doe Defendants be seen attempting to render aid to Autumn as she bled in the street as a result of the projectiles fired by Doe Defendants.[1]

91.     From the time that Autumn reached the intersection of East Lake Street and Hiawatha Avenue, until the time she was injured, Autumn never exited her vehicle.

92.     From the time that Autumn reached the intersection of East Lake Street and Hiawatha Avenue, until the time she was injured, Autumn never participated in any protesting, rioting, or property damage.

93.     At all times mentioned, Doe Defendants were acting under the color of the statutes, ordinances, regulations, customs, and usages of Defendant Minneapolis and the State of Minnesota under the authority of their respective office as police officers.

94.     MINN. STAT. § 629.32 instructs that "[a] peace officer making an arrest may not subject the person arrested to any more restraint than is necessary for the arrest and detention." Accordingly, Minnesotans have a liberty interest in freedom from the use of excessive force grounded in substantive state law.

95.     MINN. STAT. § 629.33 instructs that "[i]f a peace officer has *informed* a defendant that the officer intends to arrest the defendant, *and* if the defendant then *flees or forcibly resists* arrest, the officer may use all necessary and lawful means to make the

---

[1] https://minnesota.cbslocal.com/video/4571655-video-shows-woman-bleeding-after-being-struck-by-apparent-rubber-bullet/

arrest." (emphasis added). Accordingly, Minnesotans have liberty interests in being informed prior to being subjected to police force and to be free from such force unless they resist or attempt to flee. Both of these liberty interests are grounded in substantive state law.

96.     Upon information and belief, the MPD recently revised its policies to make clear that the least amount of force necessary must be used; this new policy indicated that the MPD's previous policies allowed excessive force to be used in violation of state statute.

   **F.    MPD's customarily excessive force against unarmed and compliant civilians.**

97.     Minneapolis enforced the emergency order through a massive deployment of MPD police officers, National Guard troops, and a consortium of law enforcement agencies, all of whom were authorized to use force against anyone outdoors after curfew regardless of whether such use of force was necessary to gain compliance.

98.     Even before curfew was in place, MPD officers used mace on protesters from their vehicles without warning and despite an absence of threat or justifiable provocation. This occurred on multiple occasions during the days immediately following George Floyd's death.

99.     During the enforcement of the curfew, police officers deployed tear gas against prone, nonresistant misdemeanants.

100.    During the enforcement of the curfew, MPD police officers fired "less lethal" projectiles indiscriminately into crowds of peaceful protesters.

101.    During the enforcement of the curfew, MPD police officers fired "less lethal" paint projectiles at individuals despite an absence of threat or justifiable provocation.

102.    During the enforcement of the curfew, MPD police officers attacked protesters from moving vehicles.

103.    On May 30, 2020, MPD police officers opened fire with "less lethal" projectiles on a clearly marked medical encampment set up to treat injured individuals in the K-Mart parking lot located at 10 W Lake Street, Minneapolis, MN 55408, despite health care providers' compliance with orders to raise their hands.

104.    During the enforcement of the curfew, MPD police officers fired "less lethal" projectiles at clearly marked press personnel despite a clear exception permitting their presence in public.

105.    During the enforcement of the curfew, MPD police officers "kettled" protesters in order to prevent them from dispersing prior to the start of the curfew and then moved in to arrest them, striking protesters with batons and pepper spray in the process.

106.    During the enforcement of the curfew, MPD police officers held arrestees in close proximity to one another despite the government's own social distancing guidelines implemented in response to the COVID-19 pandemic.

107.    These actions were widely reported by local, regional, and national news outlets and through social media; Mayor Frey and Chief Arradondo were aware of the ongoing excessive force complaints.

108.    As Photojournalist Lucas Jackson reported, "[i]t's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight. I've been hit because I was in the wrong place before. I've never been aimed at so deliberately so many times when I was avoiding it."

109.    Mayor Frey and Governor Walz acknowledged ongoing use of excessive force used against peaceful protesters as an unfortunate result of curfew enforcement.

110.    This massive use of force was authorized, either explicitly or tacitly, by Defendant Minneapolis through its agents Mayor Frey and Chief Arradondo. This is evidenced through warnings issued at the time the curfew was implemented and by the pervasive use of force by MPD and other law enforcement agencies employed at all times throughout the relevant time period.

111.    Even if this use of force was not explicitly authorized by Defendant Minneapolis, it resulted from the city's failure to supervise or provide adequate instruction to their officers despite their awareness of the ongoing issues.

112.    Even prior to the curfew, MPD officers have a long history of engaging in excessive force against unarmed civilians; these represent practices that MPD, and by extension Minneapolis, has long ignored and tacitly approved of. Multiple lawsuits alleging the use of excessive force by MPD police officers have been filed against Defendant Minneapolis over the past 10 years.

113.    Upon information and belief, settlements were reached in the vast majority, if not all, of these cases, meaning Defendant Minneapolis was on notice of MPD's

ongoing pattern of reckless violence, as the Mayor is notified of all litigation brought against the city and must approve all settlements.

114.   Impunity is the norm, and of the 2,013 disciplinary complaints filed against MPD officers in the past seven years, only 31, or 1.5 percent, ended in serious discipline.

115.   MPD's culture accepts and allows the use of excessive force as a customary part of the job.

116.   All MPD officers are represented by the Police Officer's Federation of Minneapolis. The federation provides union representation to all officers and negotiates on their behalf with the city.

117.   The federation's elected president, Lieutenant Robert Kroll ("Kroll"), acts as an unofficial policymaker within the MPD. As the president of the union, Kroll is an important culture maker in the office, and he acts as a de facto policy maker for many of the officers. As president, he is elected by MPD officers.  Their affirmative choice of him as a leader reflects on the culture of the department.

118.   Kroll's June 2 statement to federation members underscores his influence throughout the department:

> What has been very evident throughout this process is you have lacked support from the top. I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge the work of MPD and continually shift blame to it. It is despicable behavior. How our command staff can tolerate it and live with themselves I do not know . . . Although I have not been visibly present, I am closely monitoring what is occurring. I commend you for the excellent police work you are doing . . . I've had numerous conversations with politicians at the state level. I gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka. I've worked with other

police leaders from New York to Las Vegas to push our messaging on a
national level.

These are not the words of a standard lieutenant; they are the words of a man who sets the

tone and culture department-wide within the MPD.

119.    Kroll is a member of the City Heat motorcycle club, which has been known

to regularly display white supremacist symbols.

120.    Defendant Minneapolis permitted so called warrior training, which prepares

police to do battle with civilians, until 2019.

121.    After 2019, the Police Federation, headed by Kroll, offered free warrior

training to MPD police officers. The union was not subject to censure or reprimand for

engaging in this conduct.

122.    No efforts were made to prevent officers from engaging in warrior training

programs despite a clear awareness regarding its popularity amongst officers and

Minneapolis officials' awareness of the propensity of such training to result in violence

perpetuated towards citizens.

G.    Injuries

123.    At a minimum, the injuries Autumn suffered rise to the level of "substantial

bodily harm," as that term is defined by MINN. STAT. § 609.02, subd. 7a.

124.    The injuries Autumn suffered also rise to the level of "great bodily harm,"

as that term is defined by MINN. STAT. § 609.02, subd. 8.

125.    Autumn suffered significant damage to her face and head as a result of

being struck with a paint canister, rubber bullet, or other projectile on May 30, 2020.

126.    The following are pictures of Autumn's injuries taken shortly after she was shot in the face by the Doe Defendants:



127.    The lesions on Autumn's face required stiches, she had severe bruising of her eyes, and the trauma from being struck with the projectile resulted in an astigmatism in her left eye that caused debilitating vision issues that still occur. Autumn now requires stronger prescription lenses to be able to see out of her left eye.

128.    Medical doctors also confirmed that Autumn was severely concussed as a result of the actions of Defendants. Autumn suffered concussion symptoms for nearly a month, and was told by doctors to sleep as much as she could, stay off her phone and other electronics, and avoid bright lights.

129.    Autumn continues to suffer from a range of lasting injuries as a result of the actions of the Defendants. She suffers from a loss of sense of smell, continual ringing in

her ears, headaches, periodic dizziness, and vision-related issues, including pixilation, making it difficult for her to see.

130.    In addition to this physical suffering, Autumn now must see a therapist for symptoms related to, upon information and belief, post-traumatic stress disorder. Autumn is unable to sleep through the night without waking up frequently with anxiety, cries through the night, and is required to take anti-anxiety medication to help relieve these symptoms, and will likely need to do so for the foreseeable future.

131.    None of these physical or mental symptoms existed before May 30, 2020 and are all a direct cause of the events that took place on May 30, 2020.

132.    Being shot by the Doe Defendants has made Autumn extremely hesitant to call the police if she were to need them and it has engendered in her a serious distrust of officers. In this manner it has deprived her of equal access to justice and protection.

133.    Autumn has incurred significant monetary costs as a result of the actions by the Defendants, including significant medical expenses, therapy expenses, and missed work as a result of her injuries.

134.    Autumn has additionally suffered extreme emotional distress, in the form of pain and suffering, as a result of Defendants' intentional actions.

**CLAIMS FOR RELIEF**

135.    Doe Defendants unprompted, unnecessary, and unannounced shooting of Autumn violated Autumn's Fourth Amendment right to be free from unreasonable seizures.

136.    Doe Defendants unprompted, unnecessary, and unannounced shooting of Autumn violated Autumn's Fourteenth Amendment rights to substantive and procedural Due Process.

137.    Defendant Minneapolis's policies and customs of encouraging and tacitly approving of known and excessive force were the moving force behind Doe Defendants' conduct in a manner sufficient for liability to attach under *Monell* and *Canton*. *See City of Canton v. Harris*, 389 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

138.    Doe Defendants unprompted, unnecessary, and unannounced shooting of Autumn constitutes a common law battery under Minnesota tort law.

139.    Doe Defendants unprompted, unnecessary, and unannounced discharge of his or her weapon towards Autumn constitutes negligence under Minnesota tort law.

140.    Defendant Minneapolis's implementation of Emergency Regulation 2020-2-1, as well as its enforcement by Chief Arradondo and Doe Defendants violated Autumn's First Amendment rights to Free Speech, Assembly.

### Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation
(Plaintiff v. Doe Defendants #1-30, *in their individual capacities*)

141.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

142.    By shooting Autumn in the face, Doe Defendants violated her constitutional right to be free from unreasonable seizures and excessive force.

143.   "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

144.   In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

145.   Courts should also consider "the availability of alternative methods of capturing or subduing a suspect." *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

146.   The Eighth Circuit has "clearly established that use of stun gun on [a] nonviolent misdemeanor arrestee" constitutes an "unreasonable exercise of force." *Brown*, 574 F.3d at 491.

147.   Given that the use of a stun gun lies lower on the continuum of force than the use of paint canisters and rubber bullets, the use of such "less lethal" projectiles against a compliant *suspected* misdemeanant, without warning, must also constitute a patently unreasonable use of force as a matter of law.

148.   Nothing Autumn or her sister did can be construed as a threat to Doe Defendants or others around them.

149.   Autumn and her sister were suspected of nothing more than violating a curfew, a misdemeanor offense.

150.   Neither Autumn or her sister fled away from or advanced towards officers prior to being shot by Doe Defendants.

151.   Accordingly, nothing could justify Doe Defendants in firing upon Autumn with a rubber bullet, paint canister, or alternative "less lethal" projectile.

152.   Minnesota precedent also indicates that striking a protester in the chest with a riot baton, without warning, without an attempt to apprehend, and without attempting to render aid precludes a finding of qualified immunity because the "law governing police use of excessive force was clearly established [as early as] 1990." *Baker v. Caplin*, 517 N.W.2d 911 (Minn. 1994).

153.   Due to precedent indicating that Doe Defendants conduct was unlawful, Defendant officers were aware of the unlawful nature of their conduct.

154.   Because of this notice, and because of the unreasonable nature of their conduct, Doe Defendants are not entitled to qualified immunity.

155.   Moreover, "a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).

156.   The Doe Officers who did not fire upon Autumn are also liable for their failure to stop their fellow officer or officers, given their concurrent failure to announce

themselves, to seek to apprehend Autumn or her sister, and their subsequent failure to render any aid.

157.   Autumn suffered serious bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

158.   Thus, Doe Defendants violated the Fourth Amendment and 42 U.S.C. § 1983.

### Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Autumn's Substantive Due Process Rights
(Plaintiff v. Doe Defendants #1-30, *in their individual capacity*)

159.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

160.   When a defendant acts deliberately, an objective standard is appropriate in the context of excessive force claims brought pursuant to the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

161.   Whether the force used against an individual violated substantive Due Process rights under the Fourteenth Amendment turns on "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. 389, 397 (2015).

162.    None of these factors apply to Autumn who was inside her stopped vehicle, facing away from the Doe Officers, and attempting to leave the protests in compliance with curfew and the orders of the Doe Officers themselves.

163.    The force applied to Autumn was sufficient to cause grievous injury, rising to the level of great bodily harm, to her face and head.

164.    Autumn made no effort to resist the officers, made no motion towards Doe Defendants, and did not carry or appear to carry anything that suggested she might be armed.

165.    Autumn suffered debilitating physical injuries, immense pain and suffering, and lasting psychological, nerve, and nervous injuries as a result of being shot in the face.

166.    Doe Defendants made no attempt to deescalate any perceived confrontation and instead resorted immediately, and without warning, to the use of "less lethal" projectiles, the very name of which illustrates their inappropriateness in this context.

167.    Autumn suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

168.    Thus, Doe Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

### Count 3: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Autumn's Right to Procedural Due Process
(Plaintiff v. Doe Defendants #1-30, *in their individual capacities*)

169.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

170.    "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Buckley v. Ray*, 848 F.3d 855, 864 (8th Cir. 2017).

171.    Autumn had such a liberty interest created by MINN. STAT. § 629.33 to be informed that she was subject to seizure before the arresting officer applied any force in seizing her.

172.    Autumn had a liberty interest in freedom from the use of any force by a police officer unless she fled or forcibly resisted. *Id.*

173.    Autumn also had a liberty interest under MINN. SSTAT. § 629.32 to be free from "any more restraint than is necessary for [her] arrest and detention."

174.    Both of these interests relate to Autumn's constitutional right to be free from physical seizure without due process of law, a right which is amongst the most important rights guaranteed by the U.S. Constitution.

175.    Shooting Autumn without warning amounted to a punishment for her suspected misdemeanor crime—i.e., violating curfew—without the benefit of a trial.

176.    By shooting Autumn without warning, Doe Officers played prosecutor, judge, jury, and executioner in a manner that deprived Autumn of her right to notice that was "reasonably calculated, under all the circumstances, to apprise [her] of the pendency of the action." *Crum v. Vincent*, 493 F.3d 988, 993 (8th Cir. 2007).

177.    Doe Defendants failure to effectuate an arrest after shooting Autumn also leads to the inevitable conclusion that their action constituted a summary determination of guilt and execution of sentence in the form of delivering a "less lethal" rubber bullet or

paint canister to Autumn's face and head at a high rate of speed and with great physical force.

178.   Autumn was provided no notice of the Doe Officers' intent to carry out this punishment and was accordingly deprived of her procedural due process rights.

179.   While procedural "[d]ue process is flexible and calls for such procedural protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal citations omitted), by failing to inform Autumn of their intention to seize or shoot her, Doe Defendants deprived Autumn of any process whatsoever.

180.   Given that the statutes in question demand she be given notice and satisfy particular criteria prior to having her person forcefully seized, Autumn was due, at the very least, notice of the officers' intent to seize her (before being shot in the face and head) as required by state statute. See MINN. STAT. § 629.33.

181.   Use of physical force by ambush and under color of law is not consistent with even the most basic principles of procedural Due Process.

182.   Even if Autumn had been notified that she was about to be placed under arrest or shot in the face, which she was not, she did not flee or pose any reasonably objective threat to officers, and accordingly, she was deprived of her liberty interest in freedom from the use of force under MINN. STAT. §§ 629.33 and 629.32.

183.   As force is only authorized in the event of flight or forceful resistance, it was not necessary in Autumn's case and, accordingly, being shot in the face and head with a rubber bullet or paint canister was unnecessary and infringed upon her liberty interests in freedom from forceful seizure.

184.    Autumn suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

185.    Thus, Doe Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 4: *Monell* and *Canton* Municipal Liability
### (Plaintiff v. Minneapolis)

186.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

187.    For years, MPD police officers have engaged in a policy and custom of using excessive force against unarmed civilians. The pervasiveness of this custom and notice to Minneapolis officials indicates it has been tacitly approved of by Defendant Minneapolis.

188.    This custom has included the repeated and pervasive use of tasers and other "less-lethal" impact weapons against unarmed civilians posing no threat to officers.

189.    During the period from May 28, 2020 to May 31, 2020, MPD police officers engaged in a custom or policy of firing "less lethal" projectiles indiscriminately at any and all civilians present in Minneapolis' public spaces.

190.    During the period from May 28, 2020 to May 31, 2020, MPD police officers engaged in a custom or policy of using excessive force and impact weapons against suspected misdemeanants despite clear legal notice of the constitutional infirmity of such practice.

191.    These customs and policies are reflected in the widespread use of force as well as warnings issued at the time suggesting that force would be used and that such practices had been authorized by Defendant Minneapolis, Mayor Frey, and Chief Arradondo.

192.    Minneapolis officials, including Mayor Frey and Chief Arradondo, approved of this use of excessive force, either explicitly through use of force policies or tacitly given the widespread reporting of extreme violence employed by MPD police officers. Defendant Minneapolis's failure to address the issue despite its notice constituted tacit approval at least, and potentially express authorization.

193.    MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the city." (MPD Policy Manual Sec. 1-301 (citing City Charter reference-Chapter 6, Section 1)).

194.    Mayor Frey and Chief Arradondo had final policymaking authority with regard to establishing written policies and training programs governing the conduct of MPD police officers performing policing functions on behalf of Defendant Minneapolis.

195.    Minneapolis officials were aware of the customs and longtime de facto policies in place throughout the MPD via settlements and media coverage but did nothing to reprimand the continued use of warrior training or, except in the most extreme cases, follow up on misconduct.

196.    Defendant Minneapolis, through Chief Arradondo and Mayor Frey, exhibited the requisite "deliberate indifference" to constitutional rights so as to establish a custom or policy and for municipal liability to attach to police officer conduct. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

197.    This indifference was evidenced by city officials' recognition of the effect the curfew order would have on lawful protesters, and their acknowledgement that legitimate, nonviolent, constitutionally protected protestors would be harmed during enforcement of the orders.

198.    The implementation of the curfew order resulted in the foreseeable and widespread use of excessive force.

199.    This level of force was authorized by city officials and the pervasiveness of the conduct illustrates a persistent and widespread custom throughout the MPD of engaging in such practices as required in order to establish municipal liability. *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

200.    Despite their knowledge of the MPD's customs and practices, Minneapolis officials, including Frey and Arradondo, failed to implement measures to address them and as a result, the abuses set forth in this Complaint, and more, occurred during the implementation of the Mayor's curfew orders.

201.    Pervasive use of excessive force, including the use of rubber bullets and paint canisters against unarmed civilians, was widely reported by media and addressed by city and state officials in press conferences indicating they were well aware of the violations, yet police violence continued, and if anything, escalated throughout the period between May 28, 2020 and May 31, 2020.

202.    The force authorized and the curfew order itself were facially unconstitutional as their immense breadth and failure to permit alternative forms of expression rendered them improper limitations of fundamental rights.

203.    "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Minneapolis' municipal liability must attach because the policies themselves were unconstitutional.

204.    Autumn suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

**Count 5: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Autumn's Right to Freedom of Movement and Presence in Public**
(Plaintiff v. Minneapolis, Doe Defendants #1-30, *in their individual capacities*)

205.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

206.    Defendants' above-described conduct violated Autumn's rights to be present in public under the Fourteenth Amendment to the United States Constitution. *City of Chicago v. Morales*, 527 U.S. 41, 53, (1999).

207.    By criminalizing the public presence of each and every Minneapolis resident or visitor for nearly half of the day, three days running, Mayor Frey's emergency regulation unduly burdened the fundamental rights of some 416,000 Minneapolis residents, many of whom lived nowhere near the sites of unrest centered around Lake Street on the city's south side and Broadway Avenue on the north.

208.    The massive overbreadth of this order renders it facially unconstitutional due to the enormous scale of constitutional infringements and its effect on the rights of more than 100,000 Minneapolis residents whose neighborhoods were entirely untouched by the unrest in the wake of George Floyd's murder.

209.    The massive overbreadth of this order also renders it facially unconstitutional as applied to Autumn.

210.    Mayor Frey's order was implemented on behalf of Defendant Minneapolis and enforced by Chief Arradondo and Doe Defendants.

211.    As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Autumn suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

212. As a direct and proximate result of Mayor Frey's order, Autumn also suffered a constitutional injury in the form of a limitation on her fundamental right to remain in public for innocent purposes.

213. Thus, Defendants violated the First Amendment and 42 U.S.C. § 1983.

**Count 6: 42 U.S.C. § 1983 – First Amendment Violation of Autumn's Rights to Freedom of Speech and Assembly**
(Plaintiff v. Minneapolis)

214. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

215. Defendants' above-described conduct violated Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.

216. Emergency Regulation 2020-2-1 was simply too broad to satisfy the strictures of constitutional inquiry.

217. Defendants' interest is maintaining order was adequately served, or could have been adequately served, by measures implicating far less onerous constitutional limitations than the sweeping curfew orders employed.

218. As outlined above, the unrest and fires that prompted Mayor Frey's order were confined to the area around the Third Precinct, along Lake Street on the city's south side and along Broadway Avenue on the city's north. Between and around these areas, much of the city was relatively calm and, in those areas, a sweeping order was unnecessary.

219.     Because Mayor Frey's order implicated rights secured under both the First and Fourteenth Amendments and because other options such as simply deploying the National Guard or administering a more localized ban on activity in affected areas offered less rights restrictive alternatives, Mayor Frey's emergency declaration imposing a city-wide curfew was not properly tailored to Defendants' interests and it cannot withstand a constitutional challenge.

220.     Because the curfew order was specifically intended to suppress speech during certain hours, it swept up a substantial amount of legitimate speech unrelated to the restoration of order, and it left few if any alternative avenues for expression available, particularly for those like Autumn who work during the day.

221.     Mayor Frey's emergency curfew order constituted an unconstitutional limit of Autumn's First Amendment rights under the "time, place and manner" analysis.

222.     As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Autumn suffered great bodily harm including but not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

223.     As a direct and proximate result of Mayor Frey's order, Autumn also suffered a constitutional injury in the form of a limitation on her fundamental right to speak, assemble with likeminded protestors and seek redress for the MPD's many grievances.

224.     Thus, Defendants violated the First Amendment and 42 U.S.C. § 1983.

## Count 7: Minn. Stat. § 466.02 – Battery
(Plaintiff v. Minneapolis, Doe Defendants #1-30, *in their official and individual capacities*)

225.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

226.    Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

227.    Minnesota law defines the tort of battery "as an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

228.    Doe Defendants committed such a battery when one or more of them aimed their weapon at Autumn and pulled the trigger causing their rubber bullet or paint canister to offensively contact Autumn's face and head causing significant injury.

229.    Because Doe Officers acted intentionally and with reason to believe that shooting an unarmed misdemeanant with a rubber bullet or paint canister was legally prohibited, they are not entitled to official immunity.

230.    The aforementioned precedent indicating that the use of "less lethal" force such as a taser, as well as the manufacturers warnings that paint canisters are not to be used without face and neck protection, provided Doe Officers with notice that firing a "less lethal" round at the face of an unarmed misdemeanant was unlawful and precludes a finding of official immunity.

231.    Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their

employment or duties whether arising out of a governmental or proprietary function." MINN. STAT. § 466.02. This is subject to several exceptions including, pertinently, "claim[s] based upon an act or omission of an officer or employee, exercising due care, in the execution of a valid or invalid statute, charter, ordinance, resolution, or rule." *Id*. at subd. 5 (emphasis added).

232.    As Doe Defendants failed to exercise due care when they fired upon Autumn without warning, Defendant Minneapolis is not exempt from liability for the actions of Doe Defendants. *See Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (applying Minnesota law) (precluding summary judgment granting immunity to either municipality or officer where decision turned on disputed fact determination).

233.    As a direct and proximate result of Doe Defendants actions, Autumn suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

234.    Thus, Defendants committed an actionable intentional tort under Minnesota law.

### Count 8: Minn. Stat. § 466.02 – Negligence
(Plaintiff v. Minneapolis, Doe Defendants #1-30, *in their official and individual capacities*)

235.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

236.    Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; Gibbs, 383 U.S. 725 (1966).

237.   In shooting Autumn with a "less-lethal" projectile, Doe Defendants "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

238.   Doe Defendants owed Autumn the duty of apprehending her in a constitutionally reasonable manner.

239.   Doe Defendants owed Autumn a duty not to unnecessarily harm her in the execution of her arrest.

240.   Doe Defendants breached both of these duties when he or she pointed his/her weapon towards Autumn and pulled the trigger.

241.   As a direct and proximate result of Doe Defendants conduct, Autumn was struck in the face with a rubber bullet or paint canister.

242.   As a direct and proximate result of Doe Defendants action, Autumn suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

243.   Thus, Defendants committed an actionable negligence tort under Minnesota law.

<u>**RELIEF REQUESTED**</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A.   With regards to claims 1, 2, 3, 5, and 6 (1983 claims), grant an award of compensatory damages, in an amount to be determined at trial, against one or more Defendants as compensation for Defendants' actions which caused

Autumn to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Autumn's ongoing medical costs and her loss of wages resulting from Defendant(s)' actions.

B.      With regard to claim 4 (*Monell* claim), grant an award of compensatory damages, in an amount to be determined at trial, against Defendant Minneapolis as compensation for Defendants' actions which caused Autumn to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Autumn's ongoing medical costs and her loss of wages resulting from Defendant's actions.

C.      With regards to claims 1, 2, 3, 5, and 6 (1983 claims), grant an award of punitive damages, in an amount to be determined at trial, against Doe Defendants in order to punish their reckless and callous indifference towards Autumn's rights under the U.S. Constitution and Minnesota State law, and to deter other members of MPD from committing similar grievous offenses in the future

D.      With regards to claims 1, 2, 3, 4, 5, and 6 (1983 & *Monell* claims), grant an award of reasonable attorney's fees, non-taxable expenses and costs

pursuant to 42 U.S.C. § 1988, or under any other relevant attorney fee statute.

E.     With regards to claims 7 and 8 (state law claims), grant an award of compensatory damages, in an amount to be determined at trial, against Doe Defendants (or Defendant Minneapolis pursuant to MINN. STAT. § 466.02 or MINN. STAT. § 3.736), or any combination thereof, as compensation for Defendants' actions which caused Autumn to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Autumn's ongoing medical costs and her loss of wages resulting from Defendant(s)' actions.

F.     Grant such other relief as may be just and reasonable.


Dated: March 16, 2021                          **MASLON LLP**


                                               By: /s Nathaniel J. Ajouri
                                               Julian C. Zebot (#0330644)
                                               Nathaniel J. Ajouri (#0401144)
                                               3300 Wells Fargo Center
                                               90 South Seventh Street
                                               Minneapolis, MN 55402
                                               Telephone:   (612) 672.8200
                                               Facsimile:   (612) 642.8200
                                               Email: julian.zebot@maslon.com
                                                      nathaniel.ajouri@maslon.com

                                               **ATTORNEYS FOR PLAINTIFF
                                               AUTUMN LARSON**