UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Autumn Larson,

      Plaintiff,

v.

City of Minneapolis and Doe Officers
#1-30, *all in their individual and official capacities*,

      Defendants.

File No. 21-cv-714 (ECT/JFD)

**OPINION AND ORDER**

---

Nathaniel John Ajouri and Julian C. Zebot, Maslon LLP, Minneapolis, MN, for Plaintiff Autumn Larson.

Kristin R. Sarff, Sharda R. Enslin, and Heather Passe Robertson, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendant City of Minneapolis.

---

On May 30, 2020, Plaintiff Autumn Larson traveled to Minneapolis from her home in Maple Grove, Minnesota, to peacefully protest George Floyd's murder. After protesting, Larson attempted to drive home. Whether by choice, accident, or necessity, Larson's route home brought her to the intersection of East Lake Street and Hiawatha Avenue, a location teeming with protest and police activity. There, unknown law enforcement officers fired projectiles. One projectile struck Larson in her face, causing serious injuries.

Larson brought this case under 42 U.S.C. § 1983 and Minnesota's Municipal Tort Claims Act, Minn. Stat. § 466.01–466.15, seeking to recover damages and attorneys' fees. The predicate federal violations for Larson's § 1983 claims fall in two categories. Larson alleges that (1) the officers used excessive force in violation of her rights under the Fourth

and Fourteenth Amendments, and (2) Minneapolis Mayor Jacob Frey's imposition of a citywide nighttime curfew was facially unconstitutional and violated her rights under the First Amendment to freedom of speech and assembly, as well as her rights under the Fourteenth Amendment to freedom of movement and public presence.

The City has moved to dismiss Larson's § 1983 claims in the second category—her First Amendment freedom-of-speech and Fourteenth Amendment freedom-of-movement claims—under Federal Rule of Civil Procedure 12(b)(6). The City's motion will be granted, but on a jurisdictional ground: Larson lacks Article III standing to pursue these claims. If that weren't so, Larson's claims would fail on their merits.

I[1]

A

The day after George Floyd's May 25, 2020 murder, "thousands of Minneapolis residents took to the city's public streets and spaces to protest." Compl. ¶ 31 [ECF No. 1]. Though the "vast majority" of protestors behaved peacefully, many did not. *Id.*, ¶¶ 31, 32. On May 27, the City "responded to a number of fires that occurred in the vicinity of the Third Precinct along Lake Street near the intersection with Hiawatha Avenue." *Id.* ¶ 32. The Third Precinct covers the City's southeast region, running west-to-east from I-35W to the Mississippi River and north-to-south from I-94 to the City's southern border. *See*

---

[1] In accordance with the standards governing Rule 12(b)(6) motions, the facts are drawn from Larson's complaint, *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014), or from "public records and materials embraced by the complaint[,]" *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008).

Minneapolis, *Resident Services*, *Police Public Safety*, *Precinct finder map*, https://www.minneapolismn.gov/resident-services/public-safety/prevent-prepare/crime-prevention/crime-alert-signup-map/ (last visited Oct. 19, 2021).

Prompted by arson, looting, and other "damage to people and property" in and around the Third Precinct, Mayor Jacob Frey declared a local emergency on May 28. Compl. ¶ 32; *see* City of Minneapolis, Mayoral Declaration of Local Emergency (May 28, 2020). By this time, Mayor Frey already had asked the State of Minnesota for aid—including National Guard deployment—because "restoring safety and calm" were "beyond the capacity and resources" of the City. *Id.* Mayor Frey ordered the City's Director of Emergency Management to "immediately request and coordinate the appropriate aid and resources from surrounding city and county jurisdictions, the State of Minnesota, and the United States Federal Government," and he convened a team of public officials to coordinate Minneapolis's response during the state of emergency. *Id.* That same day, Minnesota Governor Tim Walz issued Emergency Executive Order 20-64, which "activat[ed] the Minnesota National Guard and declar[ed] a peacetime emergency to provide safety and protection to the people of Minneapolis, St. Paul, and surrounding communities." State of Minnesota, EEO 20-64 (May 28, 2020).

On May 29, Governor Walz, Mayor Frey, and other public officials in and around the Twin Cities issued emergency temporary nighttime curfew orders.[2] Governor Walz,

---

[2]    Mayors of at least eight nearby cities and one county board imposed the same or similar curfews on May 29. *See* ECF No. 26-1.

acting "in coordination with the Cities of Minneapolis and Saint Paul," did so through Emergency Executive Order 20-65.  State of Minnesota, EEO 20-65 (May 29, 2020). Governor Walz observed that arson, looting, and destruction of property had continued in Minneapolis.  Residential buildings had been destroyed and a police precinct set on fire. *Id.*  Noting that "much of the destruction and violence ha[d] taken place under the cover of darkness," Governor Walz imposed a curfew "in all public places within the City of Minneapolis and the City of Saint Paul" from 8:00 p.m. on May 29 until 6:00 a.m. on May 30, and again from 8:00 p.m. on May 30 until 6:00 a.m. on May 31.  *Id.* at 2.  With some exceptions, Governor Walz's curfew banned "all persons" from "travel[ing] on any public street or in any public place" in either city.  *Id.* at 2.  Governor Walz issued successive executive orders imposing nighttime curfews in Minneapolis and St. Paul, though eventually with more limited hours, through the morning of June 5, 2020.  *See* State of Minnesota, EEO 20-71 (June 3, 2020).

To "protect public health, safety, and welfare," Mayor Frey subsequently issued Emergency Regulation No. 2020-2-1—a substantially similar, overlapping, citywide curfew in Minneapolis—for the same nighttime periods covered by Governor Walz's Executive Order.  Compl. ¶ 37; City of Minneapolis, ER 20-2-1 (May 29, 2020).  Mayor Frey's curfew order prohibited travel in "any public place," which the order defined to mean "any place, whether on privately or publicly owned property, accessible to the general public, including but not limited to public streets and roads, alleys, highways, driveways, sidewalks, parks, vacant lots, and unsupervised property." *Id.*  Mayor Frey issued successive orders extending the curfew, though eventually with more limited hours,

through the morning of June 3, 2020.  *See* City of Minneapolis, ER 2020-2-2 (May 31, 2020) (extending curfew from 8:00 p.m. on May 31 through 6:00 a.m. on June 1); City of Minneapolis, ER 2020-2-3 (June 1, 2020) (extending curfew from 10:00 p.m. on June 1 through 4:00 a.m. on June 2, and from 10:00 p.m. on June 2 through 4:00 a.m. on June 3).

B

On May 30, Larson drove to Minneapolis from her home in Maple Grove, Minnesota, "to peacefully protest the killing of George Floyd."  Compl. ¶¶ 10–11, 42. Larson sought to "make known and voice her displeasure with the violence perpetuated by [Minneapolis Police Department] officers against people of color and particularly against African-American men."  *Id.* ¶ 42.  She parked her car on Stevens Avenue around 7:00 p.m. and walked to a protest "principally located on East 31st Street and Nicollet Avenue." *Id.* ¶¶ 43–44.[3]  This protest was peaceful—people recited prayers, told stories, and gave speeches.  *Id.* ¶ 46.

Larson remained at this protest "until approximately 8:00 p.m.," when those in attendance began walking east towards Stevens Avenue.  *Id.* ¶¶ 47–48.  "Done with protesting and attempting to comply with the curfew order," Larson "followed this group of people so that she could retrieve her car and return home."  *Id.* ¶ 49.  By this time, Larson's presence on the street violated the curfews imposed by Governor Walz and Mayor Frey.  *Id.* ¶ 50; EEO 20-65; ER 20-2-1.

---

[3]     Nicollet Avenue intersects with West 31st Street, not East 31st Street, as Larson alleges.

When Larson was within "approximately one block" of her car, police officers without warning fired "tear gas, flash bang grenades, and other projectiles into the group of people." *Id.* ¶ 51. This caused "confusion, disorientation, and fear" among the crowd, including Larson, who retreated several blocks "to escape injury from the[] projectiles." *Id.* ¶¶ 53–54. Larson's retreat left her "even further away from her parked car than when she started." *Id.* ¶ 54. After sheltering briefly in a local resident's home, Larson tried again to walk in the direction of her parked car but was met by police officers who deployed projectiles and "charge[ed] at" her. *Id.* ¶¶ 55–56, 58–60. Larson fled. "Another local resident allowed [Larson] . . . to wait in the resident's yard until the police presence dissipated and [Larson] could safely return to [her] car." *Id.* ¶¶ 61–62.

Larson drove to the intersection of East Lake Street and Hiawatha Avenue/Highway 55 and tried to access northbound Highway 55 to return home. *Id.* ¶¶ 61–63. Though a large group of protestors initially blocked Larson's path to the highway, and despite a "large police presence" nearby, Larson managed to enter the on-ramp to northbound Highway 55. *Id.* ¶¶ 64–66. Once there, however, a vehicle obstructed Larson's path, and "police officers began shouting at [Larson] to leave the area." *Id.* ¶¶ 66–68. Larson rolled down her car window to hear the officers, and as she continued to try to maneuver around the vehicle obstructing her path to the highway, an unidentified officer "fired a cannister of tear gas directly at her car." *Id.* ¶¶ 69–70. The resulting tear gas choked and blinded Larson. *Id.* ¶ 71. She moved her head to the open window and an unidentified officer, without warning, deployed a projectile "directly" at Larson's face, "striking her on the bridge of her nose" and "knocking her unconscious at the wheel of her

6

still-running car." *Id.* ¶¶ 71–73.  The unknown officers did not detain Larson or attempt to render aid.  *Id.* ¶¶ 83–84.  Larson regained consciousness, collected herself, and was taken to a hospital to treat her injuries.  *Id.* ¶¶ 81–82, 125–134.

C

Larson brought this lawsuit against the City of Minneapolis and thirty "Doe Officers" whose "true names and capacities" were currently unknown in March 2021, when Larson filed her complaint.  *Id.* ¶ 20.  The Doe Officers are "likely members of the [Minneapolis Police Department], though they may have been operating in Minneapolis at the direction of the Mayor and Governor under the auspices of another law enforcement agency."  Compl. ¶¶ 18–19, 21.

Larson asserted eight claims in her complaint, six under 42 U.S.C. § 1983, and two under Minnesota's Municipal Tort Claims Act, Minn. Stat. § 466.01–466.15.  As predicate federal violations for her § 1983 claims, Larson alleges that the officers used excessive force in violation of her rights under the Fourth Amendment (Count 1), and in violation of her rights to substantive due process (Count 2) and procedural due process (Count 3) under the Fourteenth Amendment, and that Mayor Frey's curfew order violated her free-speech-and-assembly rights under the First Amendment (Count 6) and her freedom-of-movement and public-presence rights under the Fourteenth Amendment (Count 5).  Compl. ¶¶ 141–185, 205–224.  Larson alleges that the City is vicariously liable for its officers' constitutional violations under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) (Count 4).  Compl. ¶¶ 186–204.  Finally, Larson asserts battery and negligence claims under Minnesota's Municipal Tort Claims Act (Counts 7 and 8).  *Id.*

¶¶ 225–243.  Larson seeks compensatory and punitive damages and attorneys' fees and costs.  *Id.* at 39–41.  Larson does not seek injunctive or declaratory relief.  *Id.*; *see also id.* ¶ 1 (describing the action as one "seeking money damages as compensation for Defendants' violation of Plaintiff's constitutional rights").

The City has moved to dismiss Larson's § 1983 claims, insofar as they are predicated on allegations that Mayor Frey's curfew order violated her First Amendment freedom-of-speech-and-assembly rights and her Fourteenth Amendment freedom-of-movement and public-presence rights, ECF No. 7, so a somewhat fuller description of these claims is useful.[4]  With respect to her First Amendment claim in Count 6, Larson alleges that Mayor Frey's curfew order was "too broad to satisfy the strictures of constitutional inquiry."  Compl. ¶ 216.  She alleges that

> the unrest and fires that prompted Mayor Frey's order were confined to the area around the Third Precinct, along Lake Street on the city's south side and along Broadway Avenue on the city's north.  Between and around these areas, much of the city was relatively calm and, in those areas, a sweeping order was unnecessary.

*Id.* ¶ 218.  She further alleges that the City's interests "could have been adequately served[] by measures implicating far less onerous constitutional limitations then the sweeping curfew orders employed."  *Id.* ¶ 217.  Larson also alleges that the curfew's duration "left few if any alternative avenues for expression available."  *Id.* ¶ 220.  Larson alleges that

---

[4]     The City originally also sought dismissal of Larson's Fourteenth Amendment excessive-force claims (Counts 2 and 3).  Larson has since agreed to dismiss her procedural-due-process claim in Count 3, *see* ECF Nos. 14, 15, and the City has withdrawn its motion with respect to Larson's substantive-due-process claim in Count 2, Reply Mem. at 2 [ECF No. 17].

"the enforcement of Mayor Frey's unconstitutional emergency regulation" caused her "great bodily harm" and the loss of fundamental First Amendment rights.  *Id.* ¶¶ 222–223. Though her complaint is not explicit, Larson has characterized her claim as one challenging the facial constitutionality of Mayor Frey's curfew.  Pl.'s Mem. in Opp'n at 10 [ECF No. 13].  In support of her Fourteenth Amendment freedom-of-movement and public-presence claim in Count 5, Larson alleges:

> By criminalizing the public presence of each and every Minneapolis resident or visitor for nearly half of the day, three days running, Mayor Frey's emergency regulation unduly burdened the fundamental rights of some 416,000 Minneapolis residents, many of whom lived nowhere near the sites of the unrest centered around Lake Street on the city's south side and Broadway Avenue on the north.

*Id.* ¶ 207.  In addition to personal injuries, *id.* ¶ 211, Larson alleges to have "suffered a constitutional injury in the form of a limitation on her fundamental right to remain in public for innocent purposes."  *Id.* ¶ 212.

## II

Two subject-matter jurisdiction issues must be addressed first.  These issues concern the facial adequacy of the jurisdictional allegations in Larson's complaint.  As such, "the court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)."  *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (citation omitted); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

A

The first issue concerns mootness. The City suggests that Larson cannot "sustain a facial challenge to the alleged overbreadth of the curfew order." Mem. in Supp. at 15 [ECF No. 9]. As the City correctly points out, the challenged curfew was temporary and has expired, circumstances that generally render an overbreadth challenge moot (thus depriving a federal court of subject-matter jurisdiction over the claim). *Massachusetts v. Oakes*, 491 U.S. 576, 582 (1989) ("[O]verbreadth analysis is inappropriate if the statute being challenged has been amended or repealed.").

The problem with this suggestion is that Larson does not allege an overbreadth challenge. Larson does not allege anywhere in her complaint that Mayor Frey's May 29 curfew order (ER 20-2-1) could constitutionally have been applied to her but not others. *See Oakes*, 491 U.S. at 581.[5] The relief Larson seeks confirms the absence of an overbreadth challenge. An overbreadth plaintiff is "barred from collecting § 1983 damages which are available only for violations of a party's own constitutional rights." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006). Here, Larson seeks only damages and attorneys' fees; she does not seek injunctive or declaratory relief.

---

[5]     It is true that Larson refers in her complaint to the "massive overbreadth" of the curfew order in support of her Fourteenth Amendment freedom-of-movement and public-presence claim. Compl. ¶¶ 208, 209. She does not use this same characterization in support of her First Amendment claim, *see id.* ¶¶ 214–224, though she does allege the curfew was "too broad to satisfy the strictures of constitutional scrutiny," *id.* ¶ 216. These broad characterizations are not enough to plausibly allege an overbreadth claim. Judged in the context of her entire complaint, what Larson really seems to allege is a facial challenge that is distinct from an overbreadth challenge—*i.e.*, "that the statute lacks any plainly legitimate sweep." *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 685 (8th Cir. 2012) (en banc) (cleaned up).

*See* Compl. ¶ 1 and at 39–41.  The curfew's expiration thus poses no jurisdictional bar to Larson's claims.

B

The second jurisdictional issue arises from Larson's failure to challenge Governor Walz's separate curfew order.  The absence of this challenge seems to mean that Larson cannot show traceability or redressability, essential elements of a federal plaintiff's Article III standing.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).  This issue was not raised by the Parties, but its jurisdictional character requires that it be addressed.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

The general rule is that a federal plaintiff fails to establish traceability, redressability, or perhaps both, "when there exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013); *see Advantage Media*, 456 F.3d at 801 (finding no redressability with respect to First Amendment overbreadth challenge because "a favorable decision for Advantage even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other unchallenged provisions of the sign code like the restrictions on size, height, location, and setback"); *Bishop v. Smith*, 760 F.3d 1070, 1078 (10th Cir. 2014) ("Courts have concluded that plaintiffs fail to establish redressability . . . when an unchallenged legal

11

obstacle is enforceable separately and distinctly from the challenged provision."); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (finding that alleged economic injuries were not traceable to federal statute restricting cockfighting because the activity "is banned to a greater or lesser degree in all fifty states and the District of Columbia" and therefore "plaintiffs' alleged economic injuries due to restrictions on cockfighting are not traceable only to the [challenged federal statute]"); *see also Renne v. Geary*, 501 U.S. 312, 326–27 (1991) (Stevens, J., concurring) (noting redressability concerns where unchallenged provision of state code "would provide an adequate basis for petitioners' challenged policy" even if the challenged provision of state constitution were struck down).

Governor Walz's overlapping curfew order appears to fit this category. Larson does not challenge the Governor's curfew. Her claims are directed against Mayor Frey's curfew only. *See* Compl. ¶¶ 140, 205–224. And Larson acknowledges that, if it was lawful, Governor Walz's curfew order prohibited her nighttime presence in Minneapolis to the same extent as Mayor Frey's curfew order. The two orders are identical in all material respects. *Compare* ER No. 2020-2-1, *with* EEO 20-65. Larson alleges explicitly in her complaint that "[i]f Mayor Frey's emergency regulation, *or Minnesota Governor Tim Walz's Emergency Executive Order No. 20-65*, were themselves lawful, [Larson's] presence on the street at or shortly after 8:00 PM was punishable as a misdemeanor." Compl. ¶ 50 (emphasis added). It is difficult to conceive how one might distinguish enforcement of these two orders. Larson nowhere alleges, for instance, facts suggesting that only Mayor Frey's curfew order curtailed her rights. In these circumstances, a judgment that Mayor Frey's order limited Larson's rights to speak, assemble, travel, or be

12

present in Minneapolis in violation of the First and Fourteenth Amendments wouldn't help Larson because Governor Walz's order prevented these same activities.  In other words, left unchallenged, the Governor's overlapping curfew lawfully deprived Larson of the same rights she seeks to vindicate in this case through her challenge to Mayor Frey's curfew order.  For this reason, Larson has failed to establish at least redressability, and there is not subject-matter jurisdiction over these aspects of her claims.

The fact that Larson has Article III standing with respect to the use-of-force aspect of her suit does not mean she has Article III standing with respect to her claims alleging violations of her First Amendment or Fourteenth Amendment travel or public-presence rights.  This is because Larson does not—and probably could not—allege that the officers' use of force violated her First Amendment rights to speak or assemble or her Fourteenth Amendment rights to travel or be present in Minneapolis.  As a factual matter, Larson's complaint does not include allegations plausibly connecting the officers' use of force to Mayor Frey's curfew.  She was not detained for or charged with a curfew violation.  Larson alleges that, prior to their use of force, officers ordered her to leave the on-ramp from East Lake Street to northbound Highway 55.  *Id.* ¶¶ 68, 70.  But she alleges no facts tying this "move-along" order to Mayor Frey's curfew, and it might have been prompted by any number of non-curfew related reasons.  In other words, Larson has not alleged any fact regarding her on-ramp interaction with the officers that makes it anything more than conceivable that the officers' use of force was connected to Mayor Frey's curfew.  That is

not enough.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[6]  As a legal matter, the Supreme Court has held "that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).[7]  Some lower federal courts "have extended *Graham* to preclude First Amendment claims based on alleged excessive force employed during an arrest."  *Price v. Elder*, 175 F. Supp. 3d 676, 679 (N.D. Miss. 2016) (citing cases); *see Anderson v. Franklin Cnty.*, 192 F.3d 1125, 1132 (8th Cir. 1999) ("[W]e agree that the conduct at issue plainly implicates the protections of the Fourth Amendment and that no cognizable § 1983 First Amendment claim has been asserted.").  These authorities cast doubt on Larson's ability to assert First and Fourteenth Amendment claims related to the officers' use of force regardless of what factual allegations she might make.  It might be different if Larson alleged that the officers fired on her in retaliation for her exercise of First or Fourteenth Amendment rights, but she doesn't allege anything like that.

*

---

[6]     Larson's allegations that she suffered "great bodily harm" and "physical injury" resulting from the curfew's enforcement, Compl. ¶ 222, are unsupported by any factual allegations connecting the officers' use-of-force to enforcement of the curfew.

[7]     Larson alleges: "By shooting [her] in the face, Doe Defendants violated her constitutional right to be free from unreasonable seizures and excessive force."  Compl. ¶ 142.

The absence of subject-matter jurisdiction usually should preclude consideration of the merits (obviously).  This case is an exception for a practical reason.  As noted, the Parties neither raised nor addressed these questions, so they have not been the subject of adversarial presentation, increasing the possibility of error on this point.  It therefore seems wiser to consider the merits in the alternative.

### III

In reviewing a motion to dismiss for failure to state a claim, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog*, 760 F.3d at 792 (citation omitted).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. 544 (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A

The law governing Larson's First Amendment facial challenge to Mayor Frey's curfew is clear in several respects.  "'A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully . . . .'"  *Phelps-Roper v. Ricketts*, 867 F.3d 883, 891 (8th Cir. 2017) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  To prevail, a plaintiff "must establish that no set of circumstances exists under which [the challenged law] would be valid, or that the statute lacks any plainly legitimate sweep."  *Id.*

at 891–92.  Ordinarily, the first step in assessing the facial constitutionality of a law is to determine whether it is content-based or content-neutral.  *Id.* at 892.  Here, Larson concedes that Mayor Frey's curfew was content neutral.  Pl.'s Mem. in Opp'n at 10 ("[Larson] does not challenge the curfew implemented by Mayor Frey as a content-based restriction on freedom of speech.").

The law is unclear in one respect.  The general rule is that, to withstand a facial First Amendment challenge, a content-neutral law must be narrowly tailored to serve a significant governmental interest and allow for ample alternative channels of communication.  *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 802 (1989).  Courts have applied this framework to facial First Amendment challenges to emergency curfews or similar orders.  *E.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1128–43 (9th Cir. 2005); *NAACP of San Jose/Silicon Valley v. City of San Jose*, ___ F. Supp. 3d ___, No. 21-cv-1705-PJH, 2021 WL 4355339, at **11–13 (N.D. Cal. Sep. 24, 2021).  Some federal courts, however, appear to have held that judicial review of an executive's decision to impose a nighttime curfew in response to civil violence and disorder is uniquely deferential.  The seminal judicial formulation of this standard appears in *United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971), *cert. denied*, 404 U.S. 943 (1971).  There, the court explained:

> It is clear that the executive's decision that civil control has broken down to the point where emergency measures are necessary is not conclusive or free from judicial review.  *See Duncan v. Kahanamoku*, 327 U.S. 304 (1946); *Sterling v. Constantin*, 287 U.S. 378 (1932); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866).  But we think the scope of our review in a case such as this must be limited to a determination of whether

> the mayor's actions were taken in good faith and whether there
> is some factual basis for his decision that the restrictions he
> imposed were necessary to maintain order.  *Cf. Moyer v.
> Peabody*, 212 U.S. 78 (1909).
>
> The federal Constitution contemplates that public policy be
> developed through reasoned debate rather than force of arms.
> Private force and violence are no less destructive of free debate
> than government oppression.   "The Constitution protects
> against anarchy as well as tyranny." *Ervin v. State*, 41 Wis.2d
> 194, 163 N.W.2d 207, 211 (1968).  *Cf. Illinois v. Allen*, 397
> U.S. 337, 347-351 (1970) (Brennan, J., concurring).
>
> The responsibility for maintaining public peace on a day-to-
> day basis is lodged with the executive branch of government.
> As we recently have become all too painfully aware, public
> peace in our cities may be suddenly breached by massive civil
> disorder.  Dealing with such an emergency situation requires
> an immediacy of action that is not possible for judges.  We
> think it would be highly inappropriate for us, removed from the
> primary responsibility for maintaining order and with the
> benefit of time for reflection not available to the mayor, to
> substitute our judgment of necessity for his.

*Chalk*, 441 F.2d at 1281 (footnotes omitted).  The *Chalk* standard—"whether the mayor's

actions were taken in good faith and whether there is some factual basis for his decision

that the restrictions he imposed were necessary to maintain order"—has been applied by

other federal courts reviewing constitutional challenges to curfew orders or similar

restrictions.  *E.g.*, *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other

grounds*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *Akindes v. City of

Kenosha*, No. 20-cv-1353-JPS-JPS, 2021 WL 4482838, at *8 (E.D. Wis. Sept. 30, 2021);

*Moorhead v. Farrelly*, 723 F. Supp. 1109, 1113–15 (D.V.I. 1989); *ACLU of W. Tenn., Inc.

v. Chandler*, 458 F. Supp. 456, 461 (W.D. Tenn. 1978).

The Eighth Circuit has not addressed this question, but for purposes of this case, it makes better sense just to apply ordinary constitutional analysis. If Mayor Frey's curfew didn't violate the First Amendment according to the usual standards, then it didn't violate the more deferential approach under *Chalk*. In other words, to the extent it articulates a more deferential test, *Chalk* matters only if Mayor Frey's curfew failed the ordinary rule. It also seems relevant that the Supreme Court, albeit in a different context, recently has expressed reluctance to depart from the norm in cases concerning public emergencies. *See Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 879–80 (D. Minn. 2021) (discussing *Roman Catholic Diocese of Brooklyn v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63 (2020), and noting its implicit rejection of a more forgiving standard of review to pandemic-related restrictions). Finally, though it would be a stretch to understand *Chalk* (and the cases following it) to apply the ordinary constitutional analysis, it also would be a mistake to think that those cases have nothing relevant to say under the ordinary analysis. What they observe about the nature of curfew-prompting circumstances bears on the significance of the governmental interest underlying a curfew's imposition. *See Chalk*, 441 F.2d at 1281.

Turning to the ordinary analysis, the disputed issue is not whether the City had a significant interest in public safety when Mayor Frey ordered the curfew. It did. *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (recognizing significance of the government's interest in exercising "police powers to protect the health and safety of their citizens") (citation omitted). If "the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property" can be described as a "significant substantive evil," *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 807 (1984),

18

or if a "city's interest in ensuring the sufficiency of sound amplification at bandshell events is a substantial one[,]" *Rock against Racism*, 491 U.S. at 796, then the City's interest in public safety implicated by the challenged curfew is undoubtedly significant.

The disputed issue is whether Mayor Frey's curfew was narrowly tailored to serve this public-safety interest and allowed for ample alternative channels of communication— or, to put it in procedural context, whether Larson has alleged facts plausibly showing it was not. Several basic rules guide analysis of these questions. A regulation is not narrowly tailored if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted). To be valid, a time, place, and manner regulation "need not be the least restrictive or least intrusive means of serving the government's interests." *Id.* (cleaned up). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Rock Against Racism*, 491 U.S. at 800. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 915 (8th Cir. 2017) (quoting *Rock Against Racism*, 491 U.S. at 799).

Larson has not alleged facts plausibly showing that Mayor Frey's curfew failed to meet these standards. The facts taken from Larson's complaint and documents embraced by it show that Mayor Frey's curfew was issued in response to a grave, pervasive danger

to public safety.  Larson alleges that, on the night of May 27, 2020, the Minneapolis Fire Department was called to respond to "fires that occurred in the vicinity of the Third Precinct along Lake Street near the intersection with Hiawatha Avenue."  Compl. ¶ 32. She acknowledges that "Mayor Frey responded by declaring a state of emergency, citing fires and unrest in the Third Precinct and surrounding area."  *Id.*  Larson acknowledges that the rioting continued into the next night, alleging that "[o]n May 28, 2020, the Fire Department again responded to a number of fires along Lake Street in the vicinity of the Third Precinct.  Several additional fires also broke out in the vicinity of Broadway Avenue on the [C]ity's north side."  *Id.* ¶ 33.  Larson alleges that "fifty-three of Minneapolis's eighty-seven neighborhoods experienced no building fires[,]" *id.* ¶ 36, meaning thirty-four (or nearly forty percent) of the City's neighborhoods did.  Mayor Frey's curfew order cited these circumstances as the basis for its imposition.   The order described the "civil disturbance . . . within the 3rd Pct. and surrounding areas with resulting damage to people and property, including several businesses and buildings that have been significantly damaged, looted, or burned[.]"  ER No. 20-2-1.  The order noted:

> Whereas, in the aftermath of the killing of Mr. Floyd and the resulting civil disturbance, public safety personnel, residents, and visitors have been and remain at risk of significant injury and death and the potential for further civil unrest or disturbance is to such an extent that extraordinary measures must be taken to protect the public health, safety, and welfare[.]

*Id.*  Governor Walz's curfew order also noted the presence of these circumstances.  The Governor's order identified "widespread civil unrest and unlawful activity in Minneapolis, Saint Paul, and surrounding communities."  EEO 20-65.  It described how, even after the

declaration of a peacetime emergency and activation of the Minnesota National Guard on May 28, "[d]estructive and dangerous activity ha[d] continued.  Individuals ha[d] looted businesses, destroyed residential buildings, and set a precinct police station on fire." *Id.*  It is difficult to imagine circumstances creating a more substantial public-safety interest.

Larson does not plausibly show that Mayor Frey's curfew order was not narrowly tailored.  Larson argues that a nighttime curfew could have been imposed in only those areas of the City that experienced "unrest."  Pl.'s Mem. in Opp'n at 11.  This contention lacks legal and plausible factual support.  The law cares, not whether "the government's interest could be adequately served by some less-speech-restrictive alternative," but whether "the means chosen are not substantially broader than necessary to achieve the government's interest[.]"  *Rock Against Racism*, 491 U.S. at 800.  Here, Larson's identification of one possible narrower curfew option does not answer this question.  If it mattered, the option Larson identifies is ill-defined and unsupported by the complaint's allegations.  The complaint alleges where "building fires" occurred in the City.  *See* Compl. ¶¶ 32–36.  The complaint alleges no facts plausibly showing that "unrest" was limited to these same areas.  If the presence of "building fires" were the benchmark, Larson's own allegations show that the scope of Mayor Frey's curfew was proportional to the public-safety risk.  The fires, Larson alleges, occurred in nearly forty percent of the City's neighborhoods.  The substantial and obvious risk that these fires, or the arson that started them, might spread unquestionably warranted a curfew beyond the neighborhoods in which building fires occurred.  Regardless, as Larson acknowledges, the Mayor's (and Governor's) curfews weren't issued based only on the risk of fire, but "the risk of

significant injury and death[,]" ER No. 20-2-1, posed by "widespread civil unrest and unlawful activity[,]" EEO 20-65.

Larson's argument that Mayor Frey's curfew did not leave open alternative channels for expression also lacks legal and factual support. "The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand[.]" *Josephine Havlak Photographer, Inc.*, 864 F.3d at 918 (quoting *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 101 (2d Cir. 2006)). It also seems necessary to judge the reasonable availability of alternative channels in view of the nature of the governmental interest at stake. *Menotti*, 409 F.3d at 1140 ("Accordingly, we apply the ample alternatives test with a practical recognition of the dire facts confronting the City[.]"). "And whether a set of facts amounts to the denial of ample alternative channels of communication is a legal conclusion to be made by the reviewing court, *see, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 53–54 (1986), not a fact to be alleged in the complaint." *Henderson v. McMurray*, 987 F.3d 997, 1003 (11th Cir. 2021).

No doubt the First Amendment deprivation here was significant. Mayor Frey's curfew (and the Governor's) deprived individuals of their right to peacefully protest George Floyd's murder and their "displeasure with the violence perpetrated by [Minneapolis Police Department] officers against people of color and particularly against African-American men[,]" Compl. ¶ 42, in public areas from 8:00 p.m. to 6:00 a.m., ER No. 20-2-1.

However, the magnitude of this deprivation was matched by the magnitude of the public-safety risk.  Judged in that context against the applicable legal standards, Mayor Frey's curfew order left alternative channels available.  When it was in effect, individuals retained the right to protest throughout the fourteen hours each day the curfew did not address.  That would leave the great majority of interested individuals, including those like Larson with full-time jobs and other responsibilities, time to publicly protest.  *Martin v. Warren*, 482 F. Supp. 3d 51, 78 (W.D.N.Y. 2020) ("To the extent that Plaintiffs wish[ed] to conduct protests larger than those permitted by the Emergency Order, they ha[d] eighteen hours per day in which they [could] do so.").  Larson does not suggest that the ability to protest during the nighttime hours addressed by the curfew was essential or significant to her message.  If, for example, Larson wanted to protest in the presence of Minneapolis Police Department officers, no facts suggest she would have been unable to do that during the day.[8]  Though Larson's claims seem to concern only the events of May 30, it's worth noting that the curfew's hours were more limited beginning June 1.  *See* ER 20-2-2 (May 31, 2020) (extending curfew from 8:00 p.m. on May 31 through 6:00 a.m. on June 1); ER 20-2-3 (June 1, 2020) (extending curfew from 10:00 p.m. on June 1 through 4:00 a.m. on June 2 and 10:00 p.m. on June 2 through 4:00 a.m. on June 3).  In other words,

---

[8]     Larson had other alternatives.  She remained free to express her views and gather with like-minded protestors during ER 20-2-1 either elsewhere, in curfew-free municipalities, or online.  *See Geller v. de Blasio*, __ F. Supp. 3d __, 20-cv-3566 (DLC), 2020 WL 2520711, at *4 (S.D.N.Y. 2020) (concluding that the plaintiff's freedom to "express her discontent online, through media, and by protesting in public on her own" provided ample alternative channels during pandemic prohibition on non-essential gatherings); *7020 Ent., LLC v. Miami-Dade Cnty.*, 519 F. Supp. 3d 1094, 1109 (S.D. Fla. 2021).

the City allowed more time to publicly protest as the public-safety threat lessened, and the curfew ended entirely on June 3. Considered against the City's substantial interests, Mayor Frey's curfew cannot plausibly be said to have deprived Larson or others of alternative channels of expression.

B

Larson's Fourteenth Amendment claim that Mayor Frey's curfew violated her rights to "freedom of movement and presence in public" fails for the same reasons her First Amendment claim failed.[9] Assuming (again) that the usual constitutional standards apply, and not the more deferential *Chalk* approach, the usual standards for evaluating this claim are the same as those applied under First Amendment. As the Third Circuit observed in analyzing a right-to-travel challenge to a cruising ordinance:

---

[9]      Questions remain concerning the existence and origin of these rights. Though other Circuits have recognized some variation of a fundamental right to be present or to move about in public, *see Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) ("right to intrastate travel, or what we sometimes will refer to as the right to free movement"); *Lutz v. City of York*, 899 F.2d 255, 268 (3d Cir. 1990) ("right to travel locally through public spaces and roadways"); *Johnson v. City of Opelousas*, 658 F.2d 1965, 1072 (5th Cir. 1981) ("the right of 'all citizens' to be free to travel within and between the states uninhibited by statutes or regulations which unreasonably burden this movement"); *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) ("right to travel locally through public spaces and roadways"); and *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) ("fundamental right of free movement"), the Eighth Circuit has yet to decide whether a fundamental right to "intrastate travel" exists under the U.S. Constitution, *Doe v. Miller*, 405 F.3d 700, 713 (8th Cir. 2005), *rehearing & rehearing en banc denied*, (June 30, 2005). In *Miller*, the Eighth Circuit noted that, assuming the right's existence, it would either be "correlative" of the right to interstate travel or consist of a substantive due process "right to travel locally through public spaces and roadways." *Id.* (quoting *Johnson*, 310 F.3d at 497–98). These issues don't matter here because the City agrees that "the Constitution does grant citizens a liberty interest in the right to public presence[.]" Mem. in Supp. at 16.

> [J]ust as the right to speak cannot conceivably imply the right to speak whenever, wherever and however one pleases—even in public fora specifically used for public speech—so too the right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases—even on roads specifically designed for public travel. Unlimited access to public fora or roadways would result not in maximizing individuals' opportunity to engage in protected activity, but chaos. To prevent that, state and local governments must enjoy some degree of flexibility to regulate access to, and use of, the publicly held instrumentalities of speech and travel. Therefore, in order to set out a workable jurisprudence for the newly recognized due process right of localized movement on the public roadways, we find it appropriate to borrow from the well-settled, highly analogous rules the Court has developed in the free speech context. The cruising ordinance will be subjected to intermediate scrutiny, and will be upheld if it is narrowly tailored to meet significant city objectives.

*Lutz*, 899 F.2d at 269–70; *accord Townes v. City of St. Louis*, 949 F. Supp. 731, 735–36 (E.D. Mo. 1996). Larson identifies no meaningful difference between her First and Fourteenth Amendment right-to-travel and public-presence claims that might warrant a different analysis or conclusion.[10]

## ORDER

Therefore, based on all the files, records, and proceedings in the above-captioned matter, **IT IS ORDERED THAT**:

1. Defendant City of Minneapolis's Motion to Dismiss [ECF No. 7] is **GRANTED**.

2. Counts 5 and 6 of the Complaint are **DISMISSED** without prejudice.

---

[10]   Dismissal would remain appropriate if stricter scrutiny applied. *See Ramos*, 353 F.3d at 176. The need for public safety in the face of widespread, severe civil unrest presented a compelling interest, and the curfew was proportional to this interest.

3.  Count 4 of the Complaint is **DISMISSED** without prejudice to the extent it is

derived from Counts 5 and 6.


Dated:  October 20, 2021                                    s/ Eric C. Tostrud
                                                            Eric C. Tostrud
                                                            United States District Court